## Rose v. Commonwealth.
(Decided Oct. 15, 1937.)

POPE & UPTON for appellant.

HUBERT MEREDITH, Attorney General, and GUY H. HERD-MAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

In January, 1930, one Arther Bunch disappeared from his home, which was located in a remote mountainous section of Whitley county, Ky., and being a part

of Pine Mountain. The section is referred to in the record as "The Pine Mountain Community," and from the description contained in the record its topography as well as its citizenry are both rugged and rough—a large portion of the latter apparently having but little regard for the law. At the time of the matters here involved many of the settlers in the "Community" were engaged in manufacturing illicit liquor contrary to the then existing Federal Amendment (Eighteenth Amendment), as well as against a section of our then prevailing Constitution (section 226a). Some days afterwards the dead body of Bunch was found in a partially opened cavern, protected by the projecting roof of a cliff near the top of the mountain. Some potato peelings and other things were found which, with some ashes from a small fire, indicated that the place had been occupied by some campers who indulged in primitive cooking. There was a hole behind his left ear, extending through his brain which was about the size of a half dollar, and indicating that it was made with a shotgun, the muzzle of which was not far away from the victim. He had evidently been dead for some days, and his body was frozen, but there was nothing to indicate robbery or other motive, nor was there anything found by which it might be determined whether the killing occurred at that place, or whether the body had been brought there after the homicide.

His brother, perhaps also his father, and other relatives, as well as acquaintances, instituted a search. The brother discovered while engaged in the search Arlie Bray (one of the defendants in this indictment) standing apparently as sentinel upon another cliff of the mountain which commanded a view of the place where the body of the deceased was later found, and which it is argued was assumed by Bray in order that he might detect any efforts made by any one to discover the location of the body. It was rumored in the "Community" that appellant, the Brays and some of the Davises—all of whom were residents in the "Community"—were jointly engaged in operating a still at a place in the mountains that the witnesses referred to as "The Camp," but which was some mile or more away from the cliff where decedent's body was found. But there is no proof in the entire case, other than the general "understanding" or rumor testified to by the witnesses—plus the fact that the federal grand jury of

London, Ky., indicted appellant for the unlawful manufacture of liquor that he ever actually engaged in that activity—none that, if he did so, it was in connection with the Brays. It was shown by a number of witnesses that they saw him prior to the disappearance of Arthur Bunch traveling some of the mountain highways or byways traversing the community, and that he was then carrying a single barrel pump shotgun. The testimony embodying the circumstantial evidence in the case as so briefly outlined is all of that class of proof that the transcript contains.

The Whitley circuit court was then in session and it indicted appellant, some or all of the Davises, and perhaps others, accusing them of committing the homicide; but defendant was never apprehended or arrested under that indictment, since he—according to his evidence and all of the other undisputed testimony in the case—immediately engaged in the process of "scouting," as they described it, and which they state was a "hiding out" in order to keep from being apprehended to answer the indictment found against him in the federal court. But the Commonwealth in the trial of the instant indictment (a history of which is related later) insist that the "scouting" referred to was to evade being arrested on the first returned indictment. At least one of the defendants therein was tried and acquitted, and some time in 1934 the then Commonwealth's attorney of the judicial district, of which Whitley county is a part, wrote and signed upon that indictment this statement: "I hereby dismiss the within indictment because there is no evidence on which to support a conviction. This 30th day of May, 1934. [Signed] H. H. Cline, Commonwealth's Attorney." An order of dismissal was made pursuant to that statement, and it is the last word concerning that indictment contained in this record.

On January 31, 1936, the instant indictment was returned by the grand jury of the same county, in which appellant, Arlie Bray, Gillis Davis, and Jim Bray were jointly accused of murdering the deceased, Arthur Bunch. At appellant's separate trial one year thereafter (January term, 1937) he was convicted and found guilty of voluntary manslaughter with an attached punishment of ten years imprisonment in the penitentiary. His motion for a new trial was overruled, and from the verdict and the judgment pronounced thereon he prosecutes this appeal. No reliance upon the order

of dismissal of the former indictment, of any character whatever, was attempted to be made, even if it had been available (but which we do not now determine), since the only plea that the defendant at his later trial relied on was one of not guilty. The Commonwealth proved the general facts as hereinbefore outlined, but in greater detail. None of it, however, had any greater probative effect on the guilt or innocence of appellant than what we have indicated and which, of course, is no more than a remote possibility or surmise that appellant may have (only because he could have) committed the murder, either alone or in conjunction with his codefendants, or possibly others. He had no greater opportunity to do so than any of the natives of the "community," nor was he better prepared to do so, since it was shown that all of them go armed with some kind of deadly shooting weapons. No motive whatever was attempted to be shown by any of the circumstances narrated by any of the witnesses, and, if appellant is to be punished for the death of Arthur Bunch as established by the proven circumstances alone, he will then practically be called upon to suffer for having been a resident in the character of community in which he was born, since he was then living with his parents in their home.

But the Commonwealth sought to establish the guilt of appellant by the testimony of Mr. and Mrs. John Wilson—the "Mrs." being Martha Ellen Wilson. They testified that they resided near the home of appellant's father, and that shortly after the body of Arthur Bunch was discovered appellant and an intimate associate, Ira Lambkin, commenced coming to their home and spending many nights there—their visits always being in the nighttime commencing about 9 o'clock, and that they would remain until about daylight the next morning, but neither of the Wilsons stated what became of them, but presumptively they would go away and later repeat their visit. The witnesses (the two Wilsons) are clearly shown by their testimony to have but meager, if any education, and they are extremely illiterate. In addition, their testimony is in many places incoherent, and they gave it in an extremely confusing and incredible fashion and manner. However, they stated that Lambkin and appellant, while at their house, continued to repeat for about five nights that "they" killed Arthur Bunch. Sometimes the witnesses stated that appellant said that he killed the deceased and that he did so "be-

cause Thurmond Bunch had $35.00 of Mitch's money and Arthur had 8 gallons of liquor of Joe's.'' The ''Thurmond Bunch'' therein referred to was and is a brother of deceased, and the ''Mitch'' in that answer was and is the father of deceased, while the name ''Joe'' referred to the appellant. So it will be seen that the only motive for the alleged killing of deceased by appellant, as set forth in the alleged admission made to the two Wilsons, was because the brother of the deceased had in some manner obtained $35 from the father of appellant, and that the deceased had in some manner obtained from him eight gallons of liquor. Both appellant and Lambkin denied all the testimony given by the two Wilsons.

A very pronounced, as well as a very material, contradiction appears in the testimony of the two Wilsons. The husband said that the visitations referred to, during which the alleged admission was made by appellant, occurred in the latter part of January, 1932, whilst the wife testified that it occurred in January, 1933, because she stated that it was (of course) after she and her husband moved to that place, which she positively insisted was in September, 1932. The husband, however, insisted that it was September, 1931, that they moved to that place coming from Lafollette, Tenn., although Mrs. Wilson was reared in that community and her husband was more or less acquainted with it. It was also uncontradictedly shown that Ira Lambkin, the companion of appellant on the alleged visits to the Wilson home, was then and had been since 1929 a member of the United States Army stationed in the Panama Canal Zone, and that he was not discharged until February 5, 1932, and it was some time thereafter before he returned to his home.

In addition to the impeaching facts that we have related, there yet remain three others, the weighing qualities of which cannot be overlooked. They are: (1) That neither of the Wilsons ever communicated to any one any information concerning the alleged admissions or confessions to which they testified for a period of more than five years after they were alleged to have been made; (2) that some short while before they did make it known they fell out with appellant, who had procured some kind of criminal prosecutions to be taken against them for some alleged violation of law, after which they became extremely indignant as well as angry

at and toward him, and they unhesitatingly admitted such hostile feelings while on the stand. No one can read this record without coming to the conclusion that the alleged admissions and confessions would still be locked up in the breasts of the witnesses testifying thereto had it not been for the prosecutions that appellant inaugurated against them. Reason (3) is, that a number of witnesses, unconnected with and disinterested in the case, impeached the two Wilsons for truth and veracity, and neither of them made any effort to sustain their reputations in that regard.

In view of the foregoing testimony found in the record, as so briefly and generally outlined, we are called upon to determine one of the grounds relied on for reversal, i. e., that the verdict was flagrantly against the evidence. All law-abiding citizens, and especially courts and their enforcement officers, should be diligent in visiting the penalties of the criminal laws upon those who violate them, to the end that the peace, safety, and good order of society might be protected. But before that is permitted to be done the law requires that the testimony to establish guilt shall be of such a nature as to remove all "reasonable doubt" of the guilt of the accused. That rule, however, does not require that all possibility of doubt should be removed by the testimony of the prosecution; but only that, if there is a doubt as to the guilt of the accused, it is required to be a reasonable one and, if such, then he should not be convicted by the court or jury trying him. Our present task is therefore to determine whether or not the verdict of the jury in this case, finding that there was no such reasonable doubt as to appellant's guilt, was or not flagrantly against the testimony.

The facts above narrated concerning the credibility of the testimony of Mr. and Mrs. Wilson—by whom only appellant's admission or confession was proven—are, to our minds, amply sufficient to not only create a reasonable doubt as to the truth of their testimony, but also sufficient to practically eliminate it from the case, leaving only in the record the utterly nonconvincing and nonprobative "circumstances" which we have hereinbefore related. The two Wilsons are indisputably shown to be utterly unreliable, even under oath; they contradict themselves on most material and vital points; neither they nor any other testimony in the case showed any credible motive for appellant committing the crime

for which he has been convicted; they kept their secret locked up in their own breasts until they became angry at appellant—because of the facts stated whereby there was created in them such a mental mood toward him as to cause them to wreak vengeance against him—all of which, plus the demonstrated falsity of the presence of Lambkin at the time of the alleged admission, without other minor circumstances in the case, abundantly create a reasonable doubt as to the truth of the testimony given by those two witnesses who were the only really material ones for the Commonwealth. We are therefore compelled to hold that the verdict in this case was and is flagrantly against the evidence to the extent that we are not only authorized to, but compelled to, reverse it for that reason alone.

An additional ground for a new trial was alleged newly discovered evidence, and counsel for appellant rely largely on it for a reversal of the judgment. In support thereof the affidavits of some twelve or more witnesses were filed, some seven or eight of whom swore that the Wilsons in conversations with them had stated that no such admissions to which they testified had ever been made to them, but that, on the contrary, they knew facts which would prove appellant was not guilty of the accusation preferred against him. The other affidavits were but cumulative with the testimony that was introduced impeaching the credibility of Wilson and wife. The latter testimony was purely cumulative in its nature and it is doubtful whether, in any event, it would be sufficient to authorize a reversal of the judgment though later discovered. The testimony of the other alleged discovered witnesses is more material; but it also is impeaching in its nature. However, we are not convinced that appellant is in any condition to rely upon it. The resort to newly discovered evidence as a ground for a reversal of a judgment has become in recent years very prolific and its employment much more frequent by defeated litigants, and especially so by those convicted for infractions of the criminal law. The law has always looked upon that ground with more or less suspicion, but at the same time has held it sufficient to authorize the setting aside of a verdict, if it were manifested that the one seeking to rely on it had exercised diligence before the completion of the trial and if it is of such nature as to be vitally material. In this case defendant was first indicted back in 1930,

charged with others of committing the same offense with which he was accused by the instant one under which he was convicted. The instant (and later) indictment itself remained upon the docket after it had been found for a year before appellant was tried. The names of the two Wilsons appeared written on it as witnesses for the prosecution, and it is also shown that at least one of his attorneys talked with them before the trial was entered into. The discovered witnesses were not away from their long-standing places of abode—all of which appears to have been located within the county where the trial was had. No reason is shown why the information they possessed could not have been ascertained and produced by the slightest investigation, and inquiry of them. We therefore seriously doubt whether this ground, upon which counsel places so much reliance, would alone authorize under the circumstances a reversal of the judgment of conviction. But, since we have concluded that for the reason hereinbefore discussed the judgment should be reversed a more detailed discussion of that ground (newly discovered evidence) will not be entered into.

Wherefore, for the reasons stated, the judgment is reversed, with directions to sustain the motion for a new trial and for proceedings consistent with this opinion. All other errors not discussed or disposed of are reserved, without any expression of opinion thereon.